Filed 4/16/26  In re C.G.-R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.G.-R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E087155 |
| | (Super.Ct.No. J286510) |
| Plaintiff and Respondent, | OPINION |
| v. | |
| C.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, and David R. Guardado, Deputy County Counsel, for Plaintiff and Respondent.

In this dependency proceeding, C.G. (Mother) appeals from the juvenile court's denial of her petition under section 388 of the Welfare and Institutions Code, which sought to reinstate reunification services as to her minor daughter, who is in the care of a legal guardian. (Unlabeled statutory references are to the Welfare and Institutions Code.) Mother also argues that the juvenile court and San Bernardino County Children and Family Services (CFS) failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related state law. We affirm.

BACKGROUND

Mother has three children: C.G. (male, born in 2006), C.G.-R. (C.R.) (female, born in 2014), and Casey C. (male, born in 2016). This appeal concerns only C.R., and the children's fathers are not parties.

The family came to the attention of CFS on September 1, 2020, when Mother and the children were living with Mother's boyfriend, Kamron L. CFS received a referral alleging that Mother physically abused then-13-year-old C.G. and emotionally abused three-year-old Casey. The referral alleged that Mother lunged at C.G. with closed fists, pushed him onto a bed, bit him on the back of his neck, choked him, and threw him out of the house.

C.G.'s father took him to the police station, where he met with a social worker. C.G. had visible bruising, scratching, and an open cut on his neck. He described the incident and told the social worker that Mother punched or slapped him about 30 percent of the time when he got into trouble. Mother spoke with a social worker, denied biting C.G., and did not understand why CFS was investigating how she disciplined him.

2

C.G.'s father reported that in 2019 Mother attacked him, bit him on the neck, and left scratch marks on his body.

CFS filed a dependency petition as to C.R., alleging under subdivisions (b)(1) and (j) of section 300 that Mother physically abused C.G. and had a history of engaging in domestic violence with her romantic partners. At the initial hearing in September 2020, the court detained C.R. and placed her with maternal grandmother Eugeneia O.

C.R. reported that she had seen Kamron push Mother. C.R. also reported an incident in which Mother and Kamron were in their bedroom with the door closed and Mother was screaming. C.R. heard things hit the wall and break, and she saw broken items in the bedroom when the door opened. Mother injured her ankle in the incident, and afterward she took the children to Casey's father's house. Three-year-old Casey also heard Mother and Kamron fighting in the bedroom and confirmed that Mother hurt her leg.

C.R. had seen Mother spank Casey and hit C.G. for not listening to her. Casey confirmed that Mother spanked him, and he saw Mother hit C.G. in the chest. C.R. said that Mother did not like C.G., called him bad names, and told him to leave the house.

Mother said that during the September 1, 2020, incident with C.G., she called him "a little bitch" and grabbed his arm to stop him from putting his finger in her face, and then she and C.G. wrestled and pushed each other. She denied that she choked or lunged at C.G., but she could not recall whether she bit him. Mother admitted that she had been "physical" with C.G. before, because he would "get in her face" or "talk back." Mother otherwise denied that she had ever slapped, punched, or choked the children.

3

Casey's father and Mother were together for 12 years. During that time, Mother repeatedly lunged at him, jumped on him, and attempted to hit him. Mother also threatened to stab him. Casey's father confirmed that in April 2020, Kamron and Mother were in a physical altercation in which Mother twisted her ankle. Kamron kicked Mother and the children out of the house, and they moved in with Casey's father. Casey's father was very angry with Mother when she got back together with Kamron a few weeks later. Both Casey's father and C.R.'s father reported that Mother had significant anger management issues.

At the jurisdiction and disposition hearing for C.R. in November 2020, Mother submitted on the domestic violence allegation under subdivision (b)(1) of section 300 and an amended allegation under subdivision (j) of section 300 stating that "Mother used inappropriate physical discipline with the minor's sibling, placing this child at similar risk." The court removed C.R. from Mother's custody and ordered reunification services. CFS believed that Mother's prognosis for reunification was fair. She had enrolled in a 12-week parenting class in September.

During the six-month review period, Mother married Kamron and moved into his home. C.R. and Casey reported that they were afraid of Kamron but also said that they did not know why. C.G. said that Mother and Kamron argued when he stayed overnight with them. Mother completed domestic violence classes, individual therapy sessions, family therapy sessions, and anger management classes. She was visiting C.R. unsupervised twice per week for a total of 12 hours.

The court continued the six-month review hearing for one month to allow minors' counsel to conduct some further investigation. CFS subsequently reported that C.R. told Casey's father that Mother slapped her, but C.R. did not say when. Casey also stated that Kamron had "'hit mommy and didn't say he was sorry.'"

In addition, CFS reported that there was an open investigation concerning one of Mother's visits. Mother was supposed to take C.G. and the other children to C.G.'s basketball game but instead went to a friend's house for a pool party. "It was reported that [Mother] drank 'mommy juice (a reference to a substance) in an adult cup for adults only.'" It was further reported that Mother was two hours late returning the children from the visit "due to her having to come down and wait around from drinking alcohol so she can drive the children home." Mother claimed that she was late because of a flat tire.

At the continued six-month review hearing in June 2021, Mother addressed the court. She argued that she should receive additional reunification services, reasoning: "At this point, with six months of no incidents and negative tests, I feel like new reunification should be done." Mother stated that she had "proven over and over and over again that the allegations are negative and false." Mother added: "I have done everything the Court has asked me to do. I have not had any incidents with the children; nothing. [¶] So I'm still having a really really hard time understanding why there's a hold off on reunifying the children with me." The court ordered continued reunification services.

In July 2021, CFS filed a supplemental petition against Mother with allegations under subdivisions (a) and (b)(1) of section 300. The petition alleged that on September

1, 2020, and on numerous prior occasions, Mother physically abused C.R. by, among other things, hitting C.R. with an open hand, a belt, and a sandal on her head, face, neck, and leg, leaving marks. The petition also alleged that C.R. was at substantial risk of harm from Mother's untreated substance abuse and that on May 28, 2021, Mother drove under the influence with the children in the car.

The court held a contested jurisdiction and disposition hearing on the supplemental petition in September 2021. Mother testified that she was not under the influence on May 28, 2021, while driving with the children in the car, never hit C.R. with her hands or objects or scratched C.R. during visits, and never coached any of the children to lie. Asked why the case initially came to CFS's attention, Mother answered that it was because she "had a physical altercation with [her] oldest son." Mother denied ever using physical discipline with the other children. The court sustained all of the allegations in the supplemental petition.

The following month, in October 2021, the court held the 12-month status review hearing. The court again continued Mother's reunification services.

In subsequent reports, CFS expressed concern that Mother's visits were retraumatizing C.R., and CFS provided a report from a psychologist who had conducted a neurodevelopmental evaluation of then-seven-year-old C.R.

The psychologist provided Eugeneia with a 90-item trauma symptom checklist for C.R. Eugeneia's responses indicated that C.R. had likely experienced at least one traumatic event or witnessed such an event in which she or someone else was threatened by death or serious bodily injury. The results indicated that C.R. was experiencing

6

posttraumatic-related intrusions, avoidance, stress, and depression.  Compared to a checklist filled out by Eugeneia five months earlier, C.R.'s "trauma-related depression and disassociation [had] decreased, [and] her post-traumatic intrusions have substantially increased."  The psychologist concluded that C.R.'s "overall social and emotional functioning [was] compromised due to her trauma experience."

The psychologist's recommendations included the following:  (1) C.R. would benefit from therapy to address symptoms of trauma; (2) C.R. "must experience predictable, consistent, responsive and nurturing caregiving in a highly structured and stable environment in order to meet her developmental potential"; and (3) it is important that C.R.'s "day be structured so that she knows what to expect and doesn't become dysregulated due to unexpected events."

CFS reported that C.R. had a strong and bonded relationship with Eugeneia.  Eugeneia was focused on C.R.'s physical and emotional needs.  C.R. was in therapy and reported that Eugeneia was the only person "who sees and hears her."  C.R.'s academic performance had improved.

Mother was still living with Kamron, but the children had some issues with him and continued to fear him.  According to C.R., Mother promised to give C.R. a phone if C.R. told the social workers that she no longer feared Kamron.

Mother had completed a domestic violence program, an anger management program, individual therapy, and family therapy with C.G.  Mother's therapist reported that Mother had made good progress on "remediation of referring problems."

7

Despite Mother's completion of her programs and the positive report from her therapist, CFS recommended that C.R. not be returned to Mother, because Mother had not applied anything that she learned to her life. For example, CFS noted that Mother coached the children to lie to the social workers about whether they feared Kamron. The social worker also observed a visit in which Mother coached the children to express their "big feelings . . . concerning their issues with the caregiver"; Mother persisted even after the children confirmed they had no such feelings, and Mother's conduct caused Casey to become emotionally dysregulated (he "regressed and made whining noises"). In addition, Mother minimized the importance of the children's therapeutic services, did not acknowledge that her behavior caused their trauma, and claimed that the children instead suffered trauma from CFS's removal. And in a final report for the contested 18-month review hearing, Mother's therapist informed the social worker that in therapy Mother did not address either her physical abuse of C.G. or her domestic violence history.

Mother also allowed Kamron to attend a video visit even though C.R. said that she did not want Kamron to attend visits. C.R. told the social worker that she continued to fear Kamron. The social worker asked C.R. if she told Mother about her feelings toward Kamron, and C.R. replied, "'She does not hear me. No one hears me but my Nanna ([Eugeneia]).'" C.R. reported that she experienced stomachaches and headaches before and after visits with Mother.

The juvenile court terminated Mother's reunification services at the 18-month review. The court reduced Mother's visitation to one two-hour supervised visit per month.

At the section 366.26 hearing in October 2022, the court ordered legal guardianship with Eugeneia and her husband, Edward, and terminated dependency jurisdiction over C.R. Although C.R. knew that Eugeneia and Edward were not her parents, she sometimes called them "mom" and "dad" because, "by taking care of her and making her feel safe and supported," they "make her feel like they are mom and dad." The court ordered a minimum of one two-hour supervised visit per month for Mother, with the visits to be supervised by the legal guardians or someone they approved.

Nearly two years later, in August 2024, Mother filed a section 388 petition seeking various modifications of the court's visitation order, such as allowing Mother to attend school activities and requiring that visitation be supervised only by a court-ordered monitor. The petition also asked the court to "reconsider reunification services." Mother asserted that the changes would be in C.R.'s best interest because they would allow C.R. to develop a relationship with Mother and Casey. The court summarily denied the petition.

In April 2025, Mother filed the section 388 petition that is the subject of this appeal. She asked the court to: "Adjust visitation orders for both [herself] the parent and [C.R.'s] sibling. Change jurisdiction to where I reside. Re-establish reunification services in residing county of the mother." As to changed circumstances, Mother asserted that Eugeneia was denying Mother visitation with C.R., in violation of the court's order. Mother asserted that the requested orders would be in C.R.'s best interest because C.R. would appreciate seeing Casey and would know that Mother wants to be a part of her life.

The court set a hearing in mid-May 2025 to determine whether to hold an evidentiary hearing on Mother's petition.

About one week after Mother filed her petition, Eugeneia filed a section 388 petition asking the court to suspend all visitation between Mother and C.R. until C.R. "is of sufficient age and ability to voice an intelligent opinion regarding visitation with an officer of the court." In over 30 pages of attachments, Eugeneia described the events that had led her to make that request.

Eugeneia stated that Mother last visited C.R. in September 2023. Eugeneia claimed that during that last visit, Mother discussed C.R.'s custody status in C.R.'s presence despite being asked not to, and Mother made inappropriate statements and promises to C.R., "such as 'don't worry baby you won't be here much longer. You're going to come home with mommy soon.'" As a result of that visit, Eugeneia decided to designate a professional agency to supervise all future visits.

In April 2025 (one week before Mother filed the most recent section 388 petition), Mother contacted the agency to arrange a visit with C.R. for the first time since September 2023. A two-hour visit was subsequently scheduled. Eugeneia told C.R. about the visit, and C.R. began complaining of various ailments, including a stomachache, headache, and diarrhea. The day before the scheduled visit C.R. "cried frantically" for two hours. She asked if Eugeneia would be there or would park nearby to watch, and she asked what would happen if Mother hurt her. Eugeneia told C.R. that someone else would supervise the visit and that C.R. could choose not to attend the visit. C.R. chose not to go to the visit, telling Eugeneia, "'I'm scared of seeing her.'"

10

Eugeneia contacted the agency to postpone the visit, explained what had been going on with C.R., and told the agency that she wanted C.R. to see "her therapist to talk it out and to process how she is feeling before we do a visit." Eugeneia then made an appointment for C.R. to see her therapist.

Several days later, a law enforcement officer arrived at Eugeneia's house to conduct a welfare check. He explained that Mother had called the police to file a report because Eugeneia was prohibiting visits, in violation of a court order. When informed that the police could not take a report because there was no alleged crime, Mother asked them to conduct a welfare check. The officer spoke with C.R. and with Eugeneia, who described the recent events concerning Mother's visitation. In the wake of that welfare check, "every time the doorbell rings," C.R. "run[s] into the room . . . asking if they are here to take her away." C.R. also expressed to her therapist "how nervous she was that they would come back and take her away." C.R.'s therapist told Eugeneia that C.R. "is exhibiting classic symptoms of C-PTSD and anxiety brought on by the reappearance of 'mom' and the Police coming to her home."

A few days later, police again came to Eugeneia's home as a result of a referral received by the child abuse hotline, alleging that C.R. was a victim of emotional abuse because she was being prevented from visiting Mother. The investigating officer spoke with C.R. "alone for approximately 15-20 minutes and then did a walk through of [the] home." He concluded that the allegations were unfounded, and he also said that C.R. "is a very smart girl, has no problem expressing herself and was clear in what she wanted, didn't want and why."

11

As a result of all of those events, Eugeneia concluded that it would be in C.R.'s best interest to suspend Mother's visitation, so she filed her section 388 petition to obtain that relief.

The court scheduled an initial hearing on Eugeneia's section 388 petition. In May 2025, CFS filed a response to both section 388 petitions. The response was based on interviews with C.R., Eugeneia, and Mother conducted in early May 2025.

The social worker confirmed that Mother had not visited C.R. since September 2023. C.R. told the social worker that she missed Mother "a lot," their visits together had been "great," and she was "very disappointed" when the visits stopped. C.R. wanted Mother to live next door so that C.R. could see her every day. But C.R. also worried that Mother would "'hit [C.R.] during a visit.'" C.R. also stated that Mother had never hit her, but she worried that it might happen even with an adult supervising the visit, because Mother used to hit C.G. C.R. said that she felt loved and safe living with Eugeneia and Edward.

C.R. had resumed individual therapy with her former therapist, and she was doing well in therapy. C.R.'s therapist believed that it would be good for C.R. to attend family therapy with Mother.

Mother reported to the social worker that she had completed her case plan by attending courses in anger management, domestic violence, and parenting and by attending 16 individual therapy sessions. Attached to CFS's report were January 2021 certificates of completion for domestic violence and anger management courses and February and March 2022 progress reports from Mother's individual therapist. All of

12

those certificates and progress reports predated the termination of Mother's reunification services.

Mother had a full-time job and lived with a roommate in Los Angeles County. Mother "acknowledged that she used to yell a lot and did hit her teenage son when he was disrespectful to her." She said that she has learned new ways to communicate and to manage her anger when she feels herself becoming upset.

CFS recommended that C.R. remain placed with the maternal grandparents and attend family therapy with Mother. CFS asked for a 90-day continuance to allow sufficient time for Mother and C.R. to attend therapy together. CFS also recommended that C.R. and Mother have one-hour supervised visits by video once per week.

At the next hearing date on both petitions, the court appointed counsel for Mother. The court granted CFS's request for a continuance and set a further hearing on Mother's petition in August 2025, which was later continued to September. The court authorized in-person visits supervised by CFS. The court also denied Eugeneia's section 388 petition, explaining that "we're going to deal with everything through Mom's paperwork."

CFS's report for the September 2025 hearing recommended that C.R. remain placed with Eugeneia but that the legal guardianship be terminated and that reunification services be ordered for Mother.

Between May and September 2025, a social worker supervised eight in-person visits and five video visits between C.R. and Mother. The social worker reported that during the first few visits C.R. was somewhat reserved while reacquainting herself with

Mother.  Mother acted "very" appropriately, which helped C.R. become comfortable quickly.  Before the second visit, the social worker gave Mother permission to have C.R. and Casey see each other on FaceTime.  C.R. had not seen Casey for over one and one-half years, because Eugeneia and Casey's father had issues with one another that impeded their ability to arrange visits.  C.R. and Casey were "overjoyed" to see one another.  With the social worker's permission, Mother brought Casey to two of the supervised visits, which went "extremely well."  C.R. and Casey appeared "very bonded," and the social worker "genuinely" believed that they should regularly visit one another.

Mother and C.R. attended a total of eight weekly therapy sessions together between June and August 2025.  CFS provided the court with a progress report from the family therapist, who reported that both Mother and C.R. were "engaged and verbal throughout," expressed themselves clearly, discussed issues concerning CFS's involvement in their lives, and listened respectfully to each other.  It was apparent to the therapist that C.R. "was willing and pleased to attend sessions."  The therapist believed that Mother and C.R. had a strong, positive bond.  The therapist supported CFS's recommendation of reunification and believed that the likelihood of successful reunification was good.

C.R. repeatedly told the social worker that she did not want to live with Mother.  C.R. reported feeling safe with Mother and would like to have overnight and weekend visits.  The social worker explained that before allowing overnight visits CFS would recommend unsupervised visits in a public setting, and C.R. agreed with that plan.  C.R. enjoyed having weekly video chats with Mother.

14

Mother's goal was to regain custody of C.R.  Mother completed an online parenting class but did not obtain a completion certificate, because of the additional cost.  CFS attached to the report copies of screenshots purporting to evidence Mother's participation in the program and the cost of the completion certificate.

At the hearing on Mother's section 388 petition, the court stated that it had a long off-the-record discussion with all counsel before the hearing.  The court acknowledged that county counsel "does not believe that [CFS's recommendation] is a proper recommendation."  (The court did not identify which aspects of the recommendation were concededly improper, but no one at the hearing defended or even mentioned the recommendation to terminate the guardianship.)  Both county counsel and minor's counsel opposed Mother's request for further reunification services.  Minor's counsel was very familiar with the history of the case and with the friction between Mother and Eugeneia.  As a result, minor's counsel repeatedly interviewed C.R. to "look[] for signs of coaching" but found none.  C.R. "consistently" told her counsel that "she's afraid of having unsupervised visits until she's older."

The court granted Mother's petition in part, finding that it was in C.R.'s best interest to visit with Mother.  The court ordered once weekly visitation for at least two hours.  The court reinstated dependency jurisdiction and set a postpermanency review hearing.

The court denied Mother's request to reinstate reunification services and transfer the case to another county, finding that Mother had not shown a material change of circumstances or that further reunification services would be in C.R.'s best interest.  The

15

court reasoned that Mother had completed the programs at issue before Mother's reunification services were terminated, Mother had not acknowledged that she physically abused C.R., and C.R. continued to have reservations about unsupervised visitation with Mother.

DISCUSSION

I.    *Section 388*

Mother argues that the juvenile court abused its discretion by denying Mother's request in her section 388 petition to reinstate reunification services.  We disagree.

"Section 388 provides for modification of juvenile court orders when the moving party (1) presents new evidence or a change of circumstance and (2) demonstrates modification of the previous order is in the child's best interest." (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194 (*Matthew M.*); § 388, subd. (a)(1).)  The petitioner bears the burden of proof on both elements.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *Matthew M.*, at p. 1194.)  In determining whether the petitioner has carried their burden, we "'may consider the entire factual and procedural history of the case.'" (*In re N.F.* (2021) 68 Cal.App.5th 112, 120 (*N.F.*).)

"'Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion.'" (*N.F.*, *supra*, 68 Cal.App.5th at p. 120.)  "We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court." (*Matthew M.*, *supra*, 88 Cal.App.5th at p. 1195.)

16

"'Not every change in circumstance can justify modification of a prior order.'" (*N.F.*, *supra*, 68 Cal.App.5th at p. 120.) "The change in circumstances supporting a section 388 petition must be material." (*Ibid.*; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [requiring a "substantial change of circumstances"]; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 [requiring the change in circumstances to be "'significant'" in nature].)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) That shift in focus informs our analysis of the children's best interests. (*Ibid.*)

The juvenile court did not abuse its discretion by denying Mother's request to reinstate reunification services. First, the court properly concluded that Mother failed to demonstrate sufficiently changed circumstances. The only program that Mother had newly completed since reunification services were terminated was an online parenting class. The other courses that Mother participated in occurred years earlier, before her reunification services were terminated in April 2022. Mother made no showing that she had gained new insight or acquired new parenting skills through the new parenting program. And the lack of explanation is particularly significant because just months after Mother attended her previous parenting class she drove while intoxicated with C.R. and Casey in the car.

17

Moreover, Mother continued to minimize and to deny the reasons for CFS's involvement. Despite the sustained allegations of serious physical abuse of C.R., Mother never admitted that she physically abused C.R. She also never admitted that she drove while intoxicated with C.R. in the car or acknowledged the domestic violence issues that she had with multiple romantic partners, which the court found placed C.R. at substantial risk of harm.[1] And Mother minimized the physical abuse that she inflicted on C.G., claiming that she hit him only because he disrespected her. On this record, Mother's "recent completion of yet another program did not constitute a material change in circumstances." (*N.F.*, *supra*, 68 Cal.App.5th at p. 122.)

Second, the court reasonably determined that granting Mother further reunification services would not promote C.R.'s best interests. C.R. has been placed with her maternal grandparents for over five years. She is thriving in their stable home, is bonded to them, and feels safe in their home. Eugeneia and Edward love C.R. and have been her legal guardians for nearly three years. Moreover, C.R. has attended therapy while living with Eugeneia and Edward and has made great progress. In contrast, when Mother filed her section 388 petition, she had not visited C.R. for about one and one-half years, and there is no evidence that she made any efforts to do so. Mother also failed to introduce evidence that she had made any meaningful progress in addressing the issues that led to

---

[1] Mother claims she did not minimize the events that led to CFS's involvement. That is incorrect. Mother ignores the sustained allegation under subdivision (a) of section 300 that she physically abused C.R. When Mother testified at the jurisdiction hearing on the supplemental petition, she denied that she ever physically abused C.R. Mother has never recanted that denial.

C.R.'s removal. For all of these reasons, Mother failed to establish that C.R.'s "'best interests in *permanency and stability* would be furthered by'" derailing her permanent and stable placement in a safe and loving home. (*N.F.*, *supra*, 68 Cal.App.5th at p. 122.)

In arguing that reinstating reunification services would promote C.R.'s best interests, Mother relies on the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532. *Kimberly F.* identified a nonexhaustive list of factors for evaluating a child's best interests under section 388, including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Ibid.*) But in a subsequent case, the same court that decided *Kimberly F.* declined to apply those factors and expressed skepticism about the soundness of *Kimberly F.*'s approach. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) The court reasoned that the *Kimberly F.* factors failed to account for our Supreme Court's holding that after the termination of reunification services the focus shifts to the dependent child's need for permanency and stability. (*In re J.C.*, at p. 527; see also Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2026) § 2.140[5] [after termination of reunification services, "the approach of the court in the case of . . . *Kimberly F.* . . . may not be appropriate since it fails to give full consideration to this shift in focus"].) Mother's argument similarly fails to account for that shift in focus and is consequently unpersuasive.

Similarly unpersuasive is Mother's reliance on evidence that would support granting her petition, such as the recommendations made by both CFS and the family therapist. We do not reweigh the evidence or ask whether substantial evidence would have supported a different result. (*Matthew M.*, *supra*, 88 Cal.App.5th at p. 1195.)

In sum, the juvenile court did not abuse its discretion by denying Mother's request to reinstate reunification services. Mother did not show either materially changed circumstances or that the requested order would promote C.R.'s best interests.

## II.    *ICWA*

Mother argues that the juvenile court erred by failing to address ICWA and that CFS failed to comply with its duty of inquiry. CFS counters that the section 388 proceeding, even with the court's resumption of jurisdiction, "is not an Indian child custody proceeding requiring compliance with ICWA." We agree with CFS.

To be an Indian child within the meaning of ICWA, a child must be either (1) a member or citizen of a federally recognized Indian tribe, or (2) eligible for membership or citizenship in such a tribe and the biological child of a member or citizen. (25 U.S.C. § 1903(4), (8); § 224.1, subds. (a)(4), (b)(1); *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 338.) The child welfare department and the juvenile court have an "affirmative and continuing duty to inquire" whether a child in a dependency proceeding "is or may be an Indian child." (§ 224.2, subd. (a).)

ICWA inquiries are required for "all Indian child custody proceedings." (§ 224, subd. (d); *In re Dezi C.* (2024) 16 Cal.5th 1112, 1129, 1130.) An "Indian child custody proceeding" is "a hearing . . . during a juvenile court proceeding . . . that may culminate

20

in" "'foster care placement,'" including "placement in the home of a legal guardian,'" "'[t]ermination of parental rights,'" "'[p]readoptive placement,'" or "'[a]doptive placement.'" (§ 224.1, subd. (d)(1) (section 224.1(d)(1)); see also § 224.3, subd. (a) [ICWA notice "shall be provided for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement"]; 25 U.S.C. § 1903(1)(i)-(iv) ["'child custody proceeding'" means and includes "'foster care placement,'" "'termination of parental rights,'" "'preadoptive placement,'" and "'adoptive placement'"].)

Mother's postpermanency section 388 proceeding is not an Indian child custody proceeding. (*In re N.F.* (2023) 95 Cal.App.5th 170, 180.) None of the above outcomes—foster care, placement with a legal guardian, termination of parental rights, and preadoptive or adoptive placement—was possible at that hearing. (§ 224.1(d)(1).) ICWA accordingly did not apply. (*In re N.F.*, at p. 180; see also *In re L.D.* (2019) 32 Cal.App.5th 579, 582-583 [order made at a gun surrender hearing not an Indian child custody proceeding because none of the outcomes set forth in § 224.1(d)(1) was possible].)

Mother's arguments to the contrary are unavailing. First, Mother argues that the hearing was an Indian child custody proceeding because CFS recommended that the guardianship be terminated and that C.R. be placed in foster care. We disagree. Mother's section 388 petition did not seek such relief, so CFS's recommendation was legally improper and did not change the nature of the proceeding. Mother's petition sought increased visitation and reunification services. The resulting proceeding was not

21

an Indian child custody proceeding within the meaning of the applicable statutes. (*N.F.*, *supra*, 95 Cal.App.5th at p. 180.)

Second, Mother argues that because of amendments to rule 5.481(a)(5) of the California Rules of Court that took effect on January 1, 2020, the juvenile court's prior ICWA findings in this case should be revisited. The argument is meritless, because the section 300 petition that initiated this case was filed after January 1, 2020.

## DISPOSITION

The September 25, 2025, order partially denying Mother's section 388 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.

LEE
J.